IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DONNA BIBBS, et al., | ) | |
| | ) | |
| *Plaintiff,* | ) | |
| *-vs-* | ) | No. 10-cv-7382 |
| | ) | |
| SHERIFF OF COOK COUNTY and COOK COUNTY, ILLINOIS, | ) | *(Judge Darrah)* |
| | ) | |
| *Defendants.* | ) | |

# PLAINTIFFS' REPLY MEMORANDUM IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

Defendant's objections to class certification are inconsistent with the Seventh Circuit's intervening decision in *McReynolds v. Merrill Lynch*, No. 11-3639 (February 24, 2012). For the reasons set out below and those previously advanced, the Court should order that this case may proceed as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure for:

> All African-Americans who, having been certified for employment as a correctional officer with the Cook County Department of Corrections by the Cook County Sheriff's Merit Board, were or will be rejected for employment by the Sheriff of Cook County on and after May 30, 2009 because of the results of scores on pre-employment tests administered at the direction of the Sheriff of Cook County.

## I. The Challenged Practices

Defendant agrees that all persons who seek employment with the Cook County Department of Corrections must be "certified" by the Cook County Sheriff's Merit Board. (Document 33-1 at 2, Nolan Affidavit, par. 8.) The Sheriff requires persons who have been certified by the Merit Board to pass five "procedures" before being hired. (Document 33-1 at 3, Nolan Affidavit, par. 11.) One of these procedures is a "psychological screening" test. (Document 33-1 at 4, Nolan Affidavit, par. 19.) Defendant will not hire any applicant who fails the psychological screening test. (Document 33-1 at 5, Nolan Affidavit, par. 24.)

Plaintiffs contend that the psychological screening test has a disparate impact on African-American applicants and, as in *Griggs v. Duke Power Co*., 401 U.S. 424 (1971), challenge the test as an unlawful employment practice under Title VII of the Civil Rights Act of 1964.

Defendants do not dispute plaintiffs' showing (Document 25 at 4), that the Sheriff has rejected more than 300 African-American applicants because of the psychological screening test. Nor do defendants argue that the proposed class of more than 300 persons satisfies the numerosity requirement of Rule 23(a). Defendants contend, however, that the proposed class fails to satisfy the commonality and typicality requirements

of Rule 23(a). (Document 33 at 4-8.) Defendants also urge that class certification would be inappropriate under Rule 23(b)(2). (Document 33 at 8-18.) Each of these objections is without merit.

## II. *McReynolds v. Merrill Lynch,* 7th Cir., No. 11-3639 (February 24, 2012) Is Dispositive of Defendants' Objections

### A. Certification Is Appropriate under Rule 23(b)(2)

In *McReynolds v. Merrill Lynch*, 7th Cir., No. 11-3969 (February 24, 2012) (attached as Exhibit 1), the Seventh Circuit analyzed a variety of class certification issues that arise in cases, like this one, raising claims of disparate impact discrimination, "that is, a discriminatory effect, though it need not be intentional." *McReynolds*, slip op. 2, Exhibit 1 at 2.

The Seventh Circuit recognized in *McReynolds* that "without proof of intentional discrimination, which is not an element of a disparate impact claim, the plaintiffs cannot obtain damages, whether compensatory or punitive, but only equitable relief (which might however include backpay, and thus have a monetary dimension)." *McReynolds*, slip op. 2, Exhibit 1 at 2.

Defendants, who filed their objections to class certification the day before the Seventh Circuit decided *McReynolds*, assert that certification under Rule 23(b)(2) is inappropriate because money damages are the "main relief" sought by plaintiffs. (Document 33 at 9.) *McReynolds*, however,

squarely rejected this argument, holding that "damages, whether compensatory or punitive" are not available when, as in this case, the plaintiffs complain about disparate impact. *Reynolds*, slip op. 2, Exhibit 1 at 2. This Court should therefore reject defendants' contention that certification would be inappropriate under Rule 23(b)(2).

### B. Plaintiffs' Claims of Disparate Impact Discrimination Present Common Questions of Fact and Law

Defendants cite *Walmart Stores, Inc. v. Duke,* 131 S.Ct. 2541 (2011), to support their argument that plaintiffs' disparate impact challenge to the psychological screening test does not present a "common contention of such a nature that it is capable of classwide resolution." (Document 33 at 5.) *Reynolds* makes plain that defendants misread *Walmart.*

The Seventh Circuit explained in *Reynolds* that (slip op. 12, Exhibit 1 at 12):

> *Walmart* holds that if employment discrimination is practiced by the employing company's local managers, exercising discretion granted them by top management (granted them as a matter of necessity, in Walmart's case, because the company has 1.4 million U.S. employees), rather than implementing a uniform policy established by top management to govern the local managers, a class action by more than a million current and former employees is unmanageable; the incidents of discrimination complained of do not present a common issue that could be resolved efficiently in a single proceeding. Fed. R. Civ. P. 23(a)(2). Not that the employer would be immune from liability even in such a case; if the local managers are acting within the scope of their employment in discriminating

> against their underlings on a forbidden ground (sex, alleged in *Walmart*, race in our case), the employer is liable for their unlawful conduct under the doctrine of respondeat superior. But because there was no company-wide policy to challenge in *Walmart*—the only relevant corporate policies were a policy *forbidding* sex discrimination and a policy of delegating employment decisions to local managers—there was no common issue to justify class treatment.

The Seventh Circuit contrasted the policy challenged in *Walmart* with an "employment decision by top management," which "would not be controlled by *Walmart.*" *Reynolds*, slip op. 15, Exhibit 1 at 15. When such a decision by top management – such as the decision in this case to use a psychological test to screen applicants – is challenged as having a disparate impact, the case presents "issues common to the entire class and therefore appropriate for class-wide determination." *Reynolds*, slip op. 16, Exhibit 1 at 16. These common issues are whether the challenged practice "causes racial discrimination and whether it nonetheless is justified by business necessity." *Id.* Moreover, "challenging those policies in a class action is not forbidden by the *Walmart* decision; rather that decision helps … to show on which side of the line that separates a company-wide practice from an exercise of discretion by local managers this case falls." *Reynolds*, slip op. 17.

## III. Typicality

Defendants argue that the claims of the named plaintiffs fail to meet the typicality standard of Rule 23(a). (Document 33 at 6-7.) Defendants agree that each of the seven named plaintiffs could have been rejected because of the psychological screening test; defendants maintain that six of the seven named plaintiffs could also have been rejected for other non-discriminatory reasons. Defendants, though, overlook the fact that their only reason for refusing to hire Zachary Smith, one of the named plaintiffs, was the psychological screening test. (Document 33-1 at 6, Nolan Affidavit, pars. 30-31.)

Defendants admit in paragraph 31 of the Nolan affidavit (Document 33-1 at 6) that

> 31. Zachary Smith was disqualified based on the recommendation of the psychologist.

The Seventh Circuit considered similar arguments from defendants in *Robinson v. Sheriff of Cook County*, 167 F.3d 1155 (7th Cir. 1999). There, a single plaintiff sought to challenge on a disparate impact theory the Sheriff's hiring practices. The district court held that Charles Robinson, the original plaintiff, could not represent the class because the Sheriff had "presented evidence that Robinson's application had been turned down because of his very poor employment record, which among

other things contained an unexplained 27-month gap between jobs." *Id.* at 1156. The Court of Appeals affirmed the denial of class certification, but made plain that the case could have proceeded as a class action if plaintiff's counsel had presented a new representative plaintiff who had filed EEOC charges. *Id.* at 1157-58. The plaintiffs in this case (and their attorney) have sought to apply the teachings of *Robinson*.

This lawsuit was filed by a single plaintiff, Donna Bibbs. When the Sheriff shared with plaintiff's counsel evidence suggesting that Bibbs, like Robinson, had been rejected for reasons other than the psychological test, plaintiff added six named plaintiffs.[1] Each of these additional named plaintiffs had filed an EEOC charge. Defendants have now presented evidence suggesting that five of the six additional plaintiffs, like Bibbs, could have been rejected for reasons other than the psychological test.[2]

*Robinson* makes plain that a case may proceed as a class action with a single class representative. Defendants' argument that six of the seven named plaintiffs would be inappropriate class representatives is therefore

---

[1] Plaintiffs, while recognizing the existence of defendants' claim that they rejected Bibbs for reasons other than the psychological test, do not concede the correctness of that explanation.

[2] Plaintiffs also do not concede the correctness of defendants' claims that they rejected all of the named plaintiffs other than Zachary Smith for reasons other than the psychological test.

of no consequence because defendants concede that Zachary Smith, one of the named plaintiffs, was disqualified for no reason other than the challenged psychological test.

## IV. Conclusion

For the reasons above stated and those previously advanced, plaintiffs request that the Court order that this case may proceed as a class action pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure for:

> All African-Americans who, having been certified for employment as a correctional officer with the Cook County Department of Corrections by the Cook County Sheriff's Merit Board, were or will be rejected for employment by the Sheriff of Cook County on and after May 30, 2009 because of the results of scores on pre-employment tests administered at the direction of the Sheriff of Cook County.

Respectfully submitted,

/s/ Kenneth N. Flaxman
Kenneth N. Flaxman
ARDC No. 830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604
(312) 427-3200
*attorney for plaintiffs*

# Exhibit 1

In the

# United States Court of Appeals

For the Seventh Circuit

No. 11-3639

GEORGE MCREYNOLDS, *et al.*, on behalf of themselves and all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 6583—**Robert W. Gettleman**, *Judge*.

ARGUED JANUARY 13, 2012—DECIDED FEBRUARY 24, 2012

Before POSNER, WOOD, and HAMILTON, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs have filed a class action suit that charges Merrill Lynch with racial discrimination in employment in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. § 1981. The plaintiffs ask that a class be certified for two purposes: deciding a common issue, Fed. R. Civ. P. 23(c)(4)—whether

the defendant has engaged and is engaging in practices that have a disparate impact (that is, a discriminatory effect, though it need not be intentional) on the members of the class, in violation of federal antidiscrimination law; and providing injunctive relief. Fed. R. Civ. P. 23(b)(2). They also want damages. But while they asked the district court to certify the class for purposes of seeking compensatory and punitive damages, see Rule 23(b)(3), at argument the plaintiffs' lawyer said she wasn't asking—not yet anyway—for such certification, though her opening brief had suggested that if we found that the district court had erred in refusing to certify for class treatment the disparate impact issue and injunctive relief, we should order the court to "consider [on remand] the extent to which damages issues also could benefit from class treatment, consistent with *Allen v. International Truck & Engine Corp.*, 358 F.3d 469 (7th Cir. 2004)." We defer that question to the end of our opinion. But we note here that without proof of intentional discrimination, which is not an element of a disparate impact claim, the plaintiffs cannot obtain damages, whether compensatory or punitive, but only equitable relief (which might however include backpay, and thus have a monetary dimension). 42 U.S.C. § 1981a(a)(1); *Kolstad v. American Dental Association*, 527 U.S. 526, 534 (1999). Section 1981a(a)(1) is explicit that damages cannot be awarded in respect of "an employment practice that is unlawful because of its disparate impact."

The district court denied certification, and the plaintiffs asked this court for leave to appeal the denial. A motions panel granted leave, but the defendant argues

that the panel erred—that the appeal is untimely. We begin with that question.

Rule 23(f) of the civil rules permits appeals from orders granting or denying class certification despite the general policy (though one with many exceptions) against allowing interlocutory appeals in the federal court system. A denial of class certification often dooms the suit—the class members' claims may be too slight to justify the expense of individual suits. Conversely, because of the astronomical damages potential of many class action suits, a grant of certification may place enormous pressure on the defendant to settle even if the suit has little merit. See, e.g., *CE Design Ltd. v. King Architectural Metals, Inc.*, 637 F.3d 721, 723 (7th Cir. 2011). And because class actions are cumbersome and protracted, an early appellate decision on whether a suit can be maintained as a class action can speed the way to termination of the litigation by abandonment, summary judgment, or settlement. E.g., *Blair v. Equifax Check Services, Inc.*, 181 F.3d 832, 834-35 (7th Cir. 1999); *Newton v. Merrill Lynch*, 259 F.3d 154, 162-65 (3d Cir. 2001).

But Rule 23(f) requires that leave to appeal be sought from the court of appeals within 14 days of the entry of the order granting or denying certification. The district court denied the plaintiffs' initial motion for class certification in August 2010. In July 2011 the plaintiffs filed an amended motion for class certification, which the district judge denied in September, and within 14 days of *that* denial the plaintiffs sought our leave to appeal. The defendant asks us to treat the request for

leave to appeal as an untimely request to appeal the August 2010 denial of certification. That would amount to treating the plaintiffs' second motion for certification as an untimely motion to reconsider the denial of the first motion.

The question of timeliness may seem to be about jurisdiction, since most deadlines for appeals from a district court have been held to be jurisdictional. But as we noted recently in *In re IFC Credit Corp.*, 663 F.3d 315, 319-20 (7th Cir. 2011), the Supreme Court has been moving toward a definition of the subject-matter jurisdiction of the federal courts that includes all cases that these courts are "competent," in the sense of legally empowered, to decide. This implies that deadlines for appealing are not jurisdictional, since they regulate the movement upward through the judicial hierarchy of litigation that by definition is within federal jurisdiction. Yet appeal deadlines either found in statutes or adopted by courts by direction of a statute continue to be treated as jurisdictional—though not all of them; the Supreme Court recently rejected such a "bright line" rule in favor of requiring a "clear indication" that the deadline was intended by Congress to be jurisdictional. *Henderson v. Shinseki*, 131 S. Ct. 1197, 1203 (2011). (The power of Congress to impose such limits on the jurisdiction of the federal courts is not questioned.) But because no "clear indication" is to be found in the pertinent statutory texts, see, e.g., 28 U.S.C. §§ 2101(c), 2107(a), (c), the Court has found itself saying such things as that Congress is not required to "use magic words in order to speak clearly on this point" and that "context, including [the Supreme

Court's] interpretation of similar provisions in many years past, is relevant." *Henderson v. Shinseki, supra*, 131 S. Ct. at 1203, quoting *Reed Elsevier, Inc. v. Muchnick,* 130 S. Ct. 1248 (2010).

What we take away from this formula is that if the Court has traditionally treated a particular statutory deadline as jurisdictional it will go on doing so, *id*. at 1203-06; *John R. Sand & Gravel Co. v. United States*, 552 U.S. 130, 134 (2008); *Bowles v. Russell*, 551 U.S. 205, 209-10 and n. 2 (2007); *In re Caterbone*, 640 F.3d 108, 111-13 (3d Cir. 2011), even though doing so doesn't comport with the new "competence" standard. Deadlines for appealing are just a type of statute of limitations, as acknowledged in *John R. Sand & Gravel v. United States*, *supra*, 552 U.S. at 133, and statutes of limitations ordinarily are affirmative defenses rather than jurisdictional bars. A deadline for bringing or appealing a federal case presupposes that the case is within the competence of federal courts to decide.

We declined in *Asher v. Baxter Int'l Inc*., 505 F.3d 736, 741 (7th Cir. 2007), to rule on whether the deadline in Rule 23(f), though it is promulgated by the Supreme Court under the authority of the Rules Enabling Act, 29 U.S.C. § 2072, rather than found in or directed to be adopted by a statute, is jurisdictional. But by now it is clear that it is not jurisdictional—that the exception to the "competence" standard is limited to statutory deadlines, *United States v. Neff*, 598 F.3d 320, 322-23 (7th Cir. 2010), for how can a court contract or expand its jurisdiction except by force of a constitutional

or statutory provision? If the deadline was made by Congress, then whether it is jurisdictional depends on congressional intent, and, the Supreme Court appears to be saying, in the absence of any clues to that intent on whether the courts traditionally have treated the deadline as jurisdictional. The time limit in Rule 23(f), having been created by the Court rather than by Congress (no time limits are specified in the Rules Enabling Act—the Act is an enabler, not a specifier), is governed by the "competence" standard and therefore is not jurisdictional, for obviously the suit from which the appeal is sought to be taken is within the jurisdiction of the federal courts.

But suppose our understanding of the evolving Supreme Court doctrine is wrong, and the deadline in Rule 23(f) *is* jurisdictional. The only difference between a deadline that is jurisdictional and one that is not is that a litigant cannot lose the benefit of the former type (until judgment becomes final after exhaustion of appellate remedies) by failing to assert it, or because the other party's failure to comply would in nonjurisdictional settings be excused by such doctrines as equitable estoppel or equitable tolling. The defendant has from the outset vigorously contested the timeliness of the appeal, and the plaintiffs are not arguing that they should be excused for having missed the deadline. Even if not jurisdictional, a deadline is mandatory in the sense that if invoked by a party in timely fashion the court is bound by it. *Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam); *Asher v. Baxter Int'l Inc.*, *supra*, 505 F.3d at 741; *Maxwell v. Dodd*, 662 F.3d 418, 421 (6th Cir. 2011); *Wilburn v. Robinson*, 480 F.3d 1140, 1146-47 (D.C. Cir. 2007).

Rather, the plaintiffs' argument is that their 14 days to seek leave to appeal ran anew from the denial of their amended motion for class certification. The defendant points out that a deadline for appealing cannot be extended by a motion for reconsideration of a previous appealable order, *Asher v. Baxter Int'l Inc.*, *supra*, 505 F.3d at 739-40; *Gary v. Sheahan*, 188 F.3d 891 (7th Cir. 1999); *Jenkins v. BellSouth Corp.*, 491 F.3d 1288, 1290-92 (11th Cir. 2007); *McNamara v. Felderhof*, 410 F.3d 277, 280-81 and n. 8 (5th Cir. 2005), unless the motion is made within the time allowed for taking the appeal, *Blair v. Equifax Check Services, Inc.*, *supra*, 181 F.3d at 837, and this rule applies to appeals under Rule 23(f). *Id.* Otherwise the deadline for taking the appeal would be eviscerated. And this is so even if the motion for reconsideration doesn't just say "and for the reasons stated in our original motion we ask the court to reverse its ruling" but adds "and by the way we have thought of some clever new arguments for why our motion should have been granted." *Carpenter v. Boeing Co.*, 456 F.3d 1183, 1190-91 (10th Cir. 2006). For it is easy to think up new arguments.

But it doesn't follow that the failure to take a timely appeal from one interlocutory order operates as a forfeiture, jurisdictional or otherwise, of the right to appeal a subsequent order. For the later motion may not be, either in form or, more important, in substance, a motion to reconsider the previous denial. A rule limiting parties to one interlocutory appeal from a grant or denial of class certification would disserve Rule 23(f). It is important that the question whether the case is to

proceed as a class action be resolved sooner rather than later. So if it becomes clear in the course of the lawsuit, as a result of new law or newly learned facts, that the denial of certification was erroneous, and if years of litigation lie ahead before a final judgment can be expected, and if therefore an appeal from the denial of certification may either end the litigation or at least place it on a path to swift resolution, the court of appeals should have discretion to allow the appeal.

The fact that the appellate court has a discretionary jurisdiction over Rule 23(f) appeals is important. Appellate jurisdiction in the federal system ordinarily is mandatory. With few exceptions, we have to decide all appeals that we have jurisdiction to hear; we do not have a discretionary appellate jurisdiction like the Supreme Court. But because our jurisdiction to hear interlocutory appeals under Rule 23(f) *is* discretionary, there is little danger that the filing in the district court of a second motion for certification based on altered circumstances, followed if it is denied by a motion in this court for leave to appeal, will either delay the district court proceedings (Rule 23(f) provides that "an appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders") or burden us or the opposing party. If the movant is playing a delay game, prompt denial by the motions panel of leave to appeal probably will end it; if he persists he will be courting sanctions in both the district court and this court for filing frivolous pleadings. And by the way, we do not permit a party to circumvent the 14-day deadline in Rule 23(f) by appealing a denial of

class certification under 28 U.S.C. § 1292(b) (authorizing interlocutory appeals that present a controlling issue of law on which there is substantial room for disagreement and prompt resolution would expedite the litigation), *Richardson Electronics, Ltd. v. Panache Broadcasting*, 202 F.3d 957, 959 (7th Cir. 2000), which has no deadline.

Dicta in the Tenth Circuit's opinion in *Carpenter v. Boeing Co.*, *supra*, go beyond the unexceptionable proposition that merely presenting "new arguments" does not change a motion for reconsideration of a grant or denial of class certification into a motion that if denied is appealable under Rule 23(f). The opinion states (456 F.3d at 1191) that

> given the multifactor analysis that courts must apply in deciding the propriety of class certification, [even appellate review limited to whatever changed circumstances had given rise to the fresh motion for certification] would often require contorted thinking that exceeds the capacities of even appellate courts. How can an appellate court say that one particular new factor would require a different result regardless of how the district court weighed the factors presented originally? In stating that the new factor required a different result, the appellate court must engage in weighing the factors weighed by the district court in its original ruling but cannot know precisely how much weight the district court granted to each. In particular, what if the district court clearly erred in giving dispositive weight to one factor? How is the appellate court to

> ignore such error (in keeping with the presumption that the original decision was correct) even when it addresses a motion for reconsideration that raises only a rather inconsequential new factor?. . . We are not inclined to adopt a construction of Rule 23(f) that would regularly require mental gymnastics just for the purpose of giving litigants a second bite at the interlocutory-appellate-review apple. We note that the very absence of a prompt appeal by the party aggrieved by the decision on certification suggests that the concerns justifying Rule 23(f) are, at the least, less significant in the particular case. If the decision whether or not to certify the class was truly outcome determinative, one would not expect the losing party to continue the litigation for months before launching a new challenge to the ruling. Any value in permitting a belated interlocutory appeal is overridden by the desirability of the district court's proceeding expeditiously.

A court of appeals is never obliged to engage in "contorted thinking" about a Rule 23(f) appeal, for it can always deny leave to appeal, and should do so if it would have to do mental contortions in order to make up its collective mind whether appeal should be allowed. And if the new motion for certification "raises only a rather inconsequential new factor," then the failure of the plaintiffs to have sought interlocutory review of the denial of the original motion for certification becomes a reason to deny leave to appeal out of hand, without any "mental gymnastics." As

for "not expect[ing] the losing party to continue the litigation for months before launching a new challenge to the ruling," the new challenge is timely if filed as soon as the development warranting a new motion for certification occurs, but untimely if the plaintiff dawdles. And if the appeal is not "belated," but based on developments that may warrant certification, allowing the appeal may very well speed up rather than slow down the litigation. In effect the court held in *Carpenter* that the new motion for certification was in substance an untimely motion for reconsideration. The holding is unexceptionable, but the dicta are not persuasive.

The basis of the plaintiffs' renewed motion for class certification in the present case was the Supreme Court's decision in *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541 (2011), handed down a month earlier. That was an important development in the law governing class certification in employment discrimination cases—possibly a milestone. It may seem a perverse basis for a renewed motion for class certification, since the Supreme Court reversed a grant of certification in what the defendant in our case insists is a case just like this one. But the district judge, though he again denied certification, didn't think the plaintiffs were perverse in basing their new motion on *Wal-Mart*. On the contrary, he said that "*Wal-Mart* does add a lot to the landscape under Rule 23 . . . . I think this really cries out for a 23(f) appeal, and I would support it. And I'm going to put that in my order [denying the renewed motion for certification—and he did] . . . . [T]his is one [case] that really cries out for [a Rule 23(f) appeal] with the change in the land-

scape by the *Wal-Mart* opinion. Of course, you know, most defendants think that the change is in their interest, not in the plaintiffs'. But you've [the judge was addressing the plaintiffs' lawyer] made a good argument, and I think it deserves to be put to rest one way or the other." The judge was right.

*Wal-Mart* holds that if employment discrimination is practiced by the employing company's local managers, exercising discretion granted them by top management (granted them as a matter of necessity, in Wal-Mart's case, because the company has 1.4 million U.S. employees), rather than implementing a uniform policy established by top management to govern the local managers, a class action by more than a million current and former employees is unmanageable; the incidents of discrimination complained of do not present a common issue that could be resolved efficiently in a single proceeding. Fed. R. Civ. P. 23(a)(2). Not that the employer would be immune from liability even in such a case; if the local managers are acting within the scope of their employment in discriminating against their underlings on a forbidden ground (sex, alleged in *Wal-Mart*, race in our case), the employer is liable for their unlawful conduct under the doctrine of respondeat superior. But because there was no company-wide policy to challenge in *Wal-Mart*—the only relevant corporate policies were a policy *forbidding* sex discrimination and a policy of delegating employment decisions to local managers—there was no common issue to justify class treatment.

The district judge thought this case like *Wal-Mart* because Merrill Lynch, accused of discriminating against

700 black brokers currently or formerly employed by it, delegates discretion over decisions that influence the compensation of all the company's 15,000 brokers ("Financial Advisors" is their official title) to 135 "Complex Directors." Each of the Complex Directors supervises several of the company's 600 branch offices, and within each branch office the brokers exercise a good deal of autonomy, though only within a framework established by the company.

Two elements of that framework are challenged: the company's "teaming" policy and its "account distribution" policy. The teaming policy permits brokers in the same office to form teams. They are not required to form or join teams, and many prefer to work by themselves. But many others prefer to work as part of a team. Team members share clients, and the aim in forming or joining a team is to gain access to additional clients, or if one is already rich in clients to share some of them with brokers who have complementary skills that will secure the clients' loyalty and maybe persuade them to invest more with Merrill Lynch. As we said, there are lone wolves, but there is no doubt that for many brokers team membership is a plus; certainly the plaintiffs think so.

The teams are formed by brokers, and once formed a team decides whom to admit as a new member. Complex Directors and branch-office managers do not select the team's members.

Account distributions are transfers of customers' accounts when a broker leaves Merrill Lynch and his cli-

ents' accounts must therefore be transferred to other brokers. Accounts are transferred within a branch office, and the brokers in that office compete for the accounts. The company establishes criteria for deciding who will win the competition. The criteria include the competing brokers' records of revenue generated for the company and of the number and investments of clients retained.

The Complex Directors, as well as the branch-office managers, have a measure of discretion with regard to teaming and account distribution; they can veto teams and can supplement the company criteria for distributions. And to the extent that these regional and local managers exercise discretion regarding the compensation of the brokers whom they supervise, the case is indeed like *Wal-Mart*. But the exercise of that discretion is influenced by the two company-wide policies at issue: authorization to brokers, rather than managers, to form and staff teams; and basing account distributions on the past success of the brokers who are competing for the transfers. Furthermore, team participation and account distribution can affect a broker's performance evaluation, which under company policy influences the broker's pay and promotion. The plaintiffs argue that these company-wide policies exacerbate racial discrimination by brokers.

The teams, they say, are little fraternities (our term but their meaning), and as in fraternities the brokers choose as team members people who are like themselves. If they are white, they, or some of them anyway, are more

comfortable teaming with other white brokers. Obviously they have their eyes on the bottom line; they will join a team only if they think it will result in their getting paid more, and they would doubtless ask a superstar broker to join their team regardless of his or her race. But there is bound to be uncertainty about who will be effective in bringing and keeping shared clients; and when there is uncertainty people tend to base decisions on emotions and preconceptions, for want of objective criteria.

Suppose a police department authorizes each police officer to select an officer junior to him to be his partner. And suppose it turns out that male police officers never select female officers as their partners and white officers never select black officers as their partners. There would be no intentional discrimination at the departmental level, but the practice of allowing police officers to choose their partners could be challenged as enabling sexual and racial discrimination—as having in the jargon of discrimination law a "disparate impact" on a protected group—and if a discriminatory effect was proved, then to avoid an adverse judgment the department would have to prove that the policy was essential to the department's mission. 42 U.S.C. § 2000e-2(k)(1)(A)(i); *Ricci v. DeStefano*, 129 S. Ct. 2658, 2672-73 (2009); *Bryant v. City of Chicago*, 200 F.3d 1092, 1098-99 (7th Cir. 2000). That case would not be controlled by *Wal-Mart* (although there is an undoubted resemblance), in which employment decisions were delegated to local managers; it would be an employment decision by top management.

Merrill Lynch's broker teams are formed by brokers, not managers, just as in our hypothetical example police officers' partners are chosen by police officers, not supervisors. If the teaming policy causes racial discrimination and is not justified by business necessity, then it violates Title VII as "disparate impact" employment discrimination—and whether it causes racial discrimination and whether it nonetheless is justified by business necessity are issues common to the entire class and therefore appropriate for class-wide determination.

And likewise with regard to account distributions: if as a result of racial preference at the team level black brokers employed by Merrill Lynch find it hard to join teams, or at least good teams, and as a result don't generate as much revenue or attract and retain as many clients as white brokers do, then they will not do well in the competition for account distributions either; and a kind of vicious cycle will set in. A portion of a team's pre-existing revenues are transferred within a team to a new recruit, who thus starts out with that much "new" revenue credited to him or her—an advantage, over anyone who is not on a team and thus must generate all of his own "new" revenue, that translates into a larger share of account distributions, which in turn helps the broker do well in the next round of such distributions. This spiral effect attributable to company-wide policy and arguably disadvantageous to black brokers presents another question common to the class, along with the question whether, if the team-inflected account distribution system does have this disparate impact, it nevertheless is justified by business necessity.

There is no indication that the corporate level of Merrill Lynch (or its parent, Bank of America) *wants* to discriminate against black brokers. Probably it just wants to maximize profits. But in a disparate impact case the presence or absence of discriminatory intent is irrelevant; and permitting brokers to form their own teams and prescribing criteria for account distributions that favor the already successful—those who may owe their success to having been invited to join a successful or promising team—are practices of Merrill Lynch, rather than practices that local managers can choose or not at their whim. Therefore challenging those policies in a class action is not forbidden by the *Wal-Mart* decision; rather that decision helps (as the district judge sensed) to show on which side of the line that separates a company-wide practice from an exercise of discretion by local managers this case falls.

Echoing the district judge, the defendant's brief states that "any discrimination here would result from local, highly-individualized implementation of policies rather than the policies themselves." That is too stark a dichotomy. Assume that with no company-wide policy on teaming or account distribution, but instead delegation to local management of the decision whether to allow teaming and the criteria for account distribution, there would be racial discrimination by brokers or local managers, like the discrimination alleged in *Wal-Mart*. But assume further that company-wide policies authorizing broker-initiated teaming, and basing account distributions on past success, increase the amount of discrimination. The incremental causal effect (overlooked by the district

judge) of those company-wide policies—which is the alleged disparate impact—could be most efficiently determined on a class-wide basis.

We are not suggesting that there is in fact racial discrimination at any level within Merrill Lynch, or that management's teaming and account distribution policies have a racial effect. The fact that black brokers have on average lower earnings than white brokers may have different causes altogether. The only issue at this stage is whether the plaintiffs' claim of disparate impact is most efficiently determined on a class-wide basis rather than in 700 individual lawsuits.

The district judge exaggerated the impact on the feasibility and desirability of class action treatment of the fact that the exercise of discretion at the local level is undoubtedly a factor in the differential success of brokers, even if not a factor that overwhelms the effect of the corporate policies on teaming and on account distributions. Obviously a single proceeding, while it might result in an injunction, could not resolve class members' claims. Each class member would have to prove that his compensation had been adversely affected by the corporate policies, and by how much. So should the claim of disparate impact prevail in the class-wide proceeding, hundreds of separate trials may be necessary to determine which class members were actually adversely affected by one or both of the practices and if so what loss he sustained—and remember that the class has 700 members. But at least it wouldn't be necessary in each of those trials to determine whether the chal-

lenged practices were unlawful. Rule 23(c)(4) provides that "when appropriate, an action may be brought or maintained as a class action with respect to particular issues." The practices challenged in this case present a pair of issues that can most efficiently be determined on a class-wide basis, consistent with the rule just quoted.

As said in *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910, 911 (7th Cir. 2003),

> class action treatment is appropriate and is permitted by Rule 23 when the judicial economy from consolidation of separate claims outweighs any concern with possible inaccuracies from their being lumped together in a single proceeding for decision by a single judge or jury. Often, and as it seems to us here, these competing considerations can be reconciled in a "mass tort" case by carving at the joints of the parties' dispute. If there are genuinely common issues, issues identical across all the claimants, issues moreover the accuracy of the resolution of which is unlikely to be enhanced by repeated proceedings, then it makes good sense, especially when the class is large, to resolve those issues in one fell swoop while leaving the remaining, claimant-specific issues to individual follow-on proceedings.

The kicker is whether "the accuracy of the resolution" would be "unlikely to be enhanced by repeated proceedings." If resisting a class action requires betting one's company on a single jury verdict, a defendant may be forced to settle; and this is an argument against definitively resolving an issue in a single case if enormous

consequences ride on that resolution. *In re Bridgestone/ Firestone, Inc.*, 288 F.3d 1012, 1020 (7th Cir. 2002); *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293, 1299-1300 (7th Cir. 1995); contra, *Klay v. Humana, Inc.*, 382 F.3d 1241, 1274 (11th Cir. 2004). But Merrill Lynch is in no danger of being destroyed by a binding class-wide determination that it has committed disparate impact discrimination against 700 brokers, although an erroneous injunction against its teaming and account distribution policies could disadvantage it in competition with brokerage firms that employ similar policies—though we have no information on whether others do.

The *Mejdrech* decision, and *Bridgestone/Firestone* and *Rhone-Poulenc* more fully, discuss the danger that resolving an issue common to hundreds of different claimants in a single proceeding may make too much turn on the decision of a single, fallible judge or jury. The alternative is multiple proceedings before different triers of fact, from which a consensus might emerge; a larger sample provides a more robust basis for an inference. But that is an argument for separate trials on pecuniary relief, and the only issue of relief at present is whether to allow the plaintiffs to seek class-wide injunctive relief. There isn't any feasible method—certainly none has been proposed in this case—for withholding injunctive relief until a series of separate injunctive actions has yielded a consensus for or against the plaintiffs.

As far as pecuniary relief is concerned, there may be no common issues (though then again there may be,

see *Allen v. International Truck & Engine Corp.*, *supra*, 358 F.3d at 472), and in that event the next stage of the litigation, should the class-wide issue be resolved in favor of the plaintiffs, will be hundreds of separate suits for backpay (or conceivably for compensatory damages and even punitive damages as well, if the plaintiffs augment their disparate-impact claim with proof of intentional discrimination). The stakes in each of the plaintiffs' claims are great enough to make individual suits feasible. Most of Merrill Lynch's brokers earn at least $100,000 a year, and many earn much more, and the individual claims involve multiple years. But the lawsuits will be more complex if, until issue or claim preclusion sets in, the question whether Merrill Lynch has violated the antidiscrimination statutes must be determined anew in each case.

We have trouble seeing the downside of the limited class action treatment that we think would be appropriate in this case, and we conclude that the district judge erred in deciding to the contrary (with evident misgivings, however). The denial of class certification under Rules 23(b)(2) and (c)(4) is therefore

REVERSED.

---

2-24-12

# CERTIFICATE OF SERVICE

I hereby certify that on the 8th day of March, 2012, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the followin John Curran, ASA, 500 Daley Center, Chicago, IL 60602, and I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: none.

/s/ Kenneth N. Flaxman

_________________________

Kenneth N. Flaxman
ARDC Number 08830399
200 S Michigan Ave, Ste 1240
Chicago, IL 60604-2430
(312) 427-3200 (phone)
(312) 427-3930 (fax)
knf@kenlaw.com (email)